351 F.3d 1120
 Sulzer Textil A.G. and Sulzer Textile, Inc., Plaintiffs-Appellants,
v.
Picanol N.V., Defendant-Cross Appellant.
 No. 02-1410.
 No. 02-1441.
 United States Court of Appeals, Federal Circuit.
 Decided December 9, 2003.
 
 COPYRIGHT MATERIAL OMITTED K.T. Cherian, Townsend & Townsend and Crew, LLP, of San Francisco, California, argued for plaintiffs-appellants. With him on the brief were J. Georg Seka and Igor Shoiket. Of counsel on the brief were Rickey L. Faulkner and S. Calvin Capshaw, Brown McCarroll, L.L.P., of Longview, Texas; and Otis Carroll, Ireland, Carroll & Kelley, P.C., of Tyler, Texas.
 John P. Rowley III, Holland & Knight LLP, of McLean, Virginia, argued for defendant-cross appellant. With him on the brief were Jennifer A. Short and Joshua C. Krumholz, of Holland & Knight LLP, of Boston, Massachusetts. Of counsel on the brief was J. Ernest Kenney, Bacon & Thomas, of Alexandria, Virginia.
 Before LOURIE, GAJARSA, and LINN, Circuit Judges. LINN, Circuit Judge.
 
 
 1
 This case presents a question as to the nature and extent to which district courts are required to give jury instructions in patent cases in which claim construction rulings on disputed claim terms are made prior to trial and followed by the parties during the course of the trial. We hold that it is the duty of trial courts in such cases to inform jurors both of the court's claim construction rulings on all disputed claim terms and of the jury's obligation to adopt and apply the court's determined meanings of disputed claim terms in the jury's deliberations of the facts.
 
 
 2
 Sulzer Textil A.G. and Sulzer Textile, Inc. (collectively, "Sulzer"), appeal from an order of the United States District Court for the Eastern District of Texas denying their motion for a new trial based on erroneous jury instructions, following a jury verdict in favor of Picanol N.V. ("Picanol"). Sulzer Textil A.G. v. Picanol N.V., No. 6:00cv279 (E.D. Tex. Apr. 19, 2002) ("Order"). Sulzer also appeals an order of the district court granting Picanol's motion in limine to preclude Sulzer from introducing evidence pertaining to infringement under the doctrine of equivalents. Sulzer Textil A.G. v. Picanol N.V., No. 6:00cv279 (E.D. Tex. Sept. 24, 2001) ("In Limine Order"). On cross-appeal, Picanol appeals an order of the district court denying its motion for attorneys' fees pursuant to 35 U.S.C. § 285. Sulzer Textil A.G. v. Picanol N.V., No. 6:00cv279 (E.D. Tex. Mar. 11, 2002) ("Fee Order"). As to the jury instructions, we conclude that the district court erred. But because Sulzer has failed to show prejudice resulting from such error, we affirm the district court's denial of Sulzer's motion for a new trial. Further, because the district court applied the appropriate legal standard in determining the case was not exceptional and did not clearly err in its factual findings supporting that determination, we affirm the district court's Fee Order as well. However, because the district court erred as a matter of law in precluding Sulzer from presenting evidence pertaining to infringement under the doctrine of equivalents, we vacate the district court's In Limine Order and remand the issue for further proceedings consistent with this opinion.
 
 BACKGROUND
 
 3
 This case concerns air-jet weaving machines for weaving threads or yarns into fabric. Woven fabric generally consists of perpendicular, interlaced threads or yarns. There are two categories of threads in a woven fabric — warp threads, extending longitudinally in the fabric, and weft threads, extending perpendicularly to the warp threads. Before weaving, a large number of parallel warp threads are arranged adjacent to each other. The fabric is then woven by inserting a weft thread, perpendicular to the warp threads, where the weft thread goes alternatively over or under each successive warp thread.
 
 
 4
 Although weaving is an ancient art, technology advances have made weaving more efficient. It would be impractical to weave any significant amount of fabric by inserting each weft over or under each warp; therefore, a weaving machine is used. A weaving machine may lift every other warp thread, relative to the remaining warp threads, forming two sets of warps — an upper set and a lower set, with a space in between, known as a "shed." A weft thread can then be inserted quickly through the shed, using one of a variety of techniques. For example, projectile-type weaving machines attach the leading edge of a weft thread to a bullet-like projectile that carries the weft through the shed. Rapier weaving machines employ long mechanical arms to carry the weft through the shed. Air-jet weaving machines use bursts of air to blow the weft thread through the shed. After the weft thread has been inserted through the shed, the upper and lower warp thread sets can then be exchanged, capturing the weft thread in a woven fashion. This process is repeated over and over to create fabric of a desired length.
 
 
 5
 With any of these types of weaving machines, the timing of the shed operation is critical. The shed must remain open from the beginning of weft insertion until the weft has reached the other side of the machine. If it closes prematurely, before the weft arrives at the other side of the fabric, a weaving fault occurs, leading to degraded fabric and potential machine stoppages. On the other hand, to optimize the rate of fabric production, the shed openings and closings must occur as rapidly as possible to increase the number of weft insertions per minute, and thus, the amount of fabric that can be produced.
 
 
 6
 Historically, the number of weft insertions per minute was limited by how rapidly the carrier of the weft could be transported through the shed. Projectile and rapier weaving machines, for example, have maximum weft insertion rates of approximately 400-500 insertions per minute. Sulzer's predecessor, the Dutch company Ruiti-Te Strake, introduced the first air-jet weaving machine in the 1970s. These machines promised a greater number of weft insertions per minute; however, they were not commercially successful because there was insufficient control over the weft insertion process. In response, Ruiti-Te Strake developed what is known as a "time controller," a system that coordinates and controls weft insertion in an air-jet weaving machine to ensure that the shed remains open until each weft is properly and fully inserted. The time controller system is the subject of U.S. Patent No. 4,446,893 ("the '893 patent"), owned by Sulzer. The time controller system permits the shed to close as soon as the weft has been fully inserted, without allowing for extra time as a safety margin, and thereby significantly increasing the number of weft insertions per minute.
 
 
 7
 The time controller of the '893 patent works by coordinating the insertion of the weft with the operational speed of the machine and making necessary adjustments to ensure fault-free operation while maintaining optimal machine speed. One embodiment disclosed in the '893 patent makes adjustments by varying the speed of the weft thread during insertion; another embodiment adjusts the speed of the machine. Claim 1, the only asserted independent claim of the '893 patent, recites:
 
 
 8
 1. In a method of controlling the operation of a weaving machine in which each weft thread is moved through a shed by means of a flowing fluid, the step of correlating the speed of the movement of each weft thread through the shed with the speed of operation of the weaving machine by:
 
 
 9
 (a) measuring the time occupied by movement of a weft thread through the shed;
 
 
 10
 (b) generating a first electrical signal which is a measure of such time;
 
 
 11
 (c) generating a second electrical signal which is a measure of a predetermined fraction of the time occupied by a weaving cycle of the machine;
 
 
 12
 (d) comparing said electrical signals and generating a third electrical signal which is a measure of the discrepancy between said first and second signals; and
 
 
 13
 (e) using said third signal to control one of said speeds in order to eliminate the discrepancy between first and second signals.
 
 
 14
 Another problem peculiar to air-jet weaving machines is caused by the manner in which weft threads are supplied. Thousands of yards of weft are typically wound onto a spool, from which thread is withdrawn by the air-jet as individual wefts are inserted through the shed. When the spool is nearing its end, the tail end of the yarn from that spool is tied to the leading edge of the thread on a fresh spool. The result is that thread from a fresh spool flies slower than thread from an old spool. Without adjusting for this change in speed, fabric faults may occur. Ruiti-Te Strake, at the same time it developed the time controller system, also invented a system whereby an air-jet weaving machine will temporarily blow more air when weft thread from a new spool is inserted to ensure that the weft arrives at the other end of the shed before it closes. This system is known as the "bobbin-changeover" invention, and is the subject of U.S. Patent No. 4,450,876 ("the '876 patent"), also owned by Sulzer. Claim 1, the only asserted independent claim of the '876 patent, recites:
 
 
 15
 1. A method for weaving on a weaving machine operating with a blowing nozzle for a flowing transport fluid, in which weft threads are measured and withdrawn from successive yarn packets, characterized in that the switching to a next yarn packet is combined with a temporary change in the feed pressure of the blowing nozzle.
 
 
 16
 Sulzer Textil AG, a Swiss company, acquired Ruiti-Te Strake as well as ownership of the '893 and '876 patents, and is one of the industry leaders in the manufacture of weaving machines. Sulzer Textile, Inc. sells and services Sulzer weaving machines and spare parts in the United States. Sulzer brought the first commercially viable air-jet weaving machine to market in the early 1980s. Picanol, a Belgian company, is also a manufacturer of air-jet weaving machines and a competitor of Sulzer. Picanol introduced its Delta, Omni, and Omni-Plus models of air-jet weaving machines to the United States market beginning in the mid-1980s. These machines incorporate a bobbin-changeover system and adaptive insertion control systems, known as AIC-T and AIC-Q, to ensure that the weft thread maintains a constant arrival time.
 
 
 17
 As early as 1987, Sulzer accused Picanol of infringing its patents. While Picanol denied infringement, the two parties discussed possible cross-licensing of a number of different patents, including the '876 and '893 patents. In 1989, the parties reached an agreement for cross-license, but the agreement was never formalized due to objections by a partner of Sulzer.
 
 
 18
 In May 2000, Sulzer filed suit against Picanol, alleging infringement of the '893 and '876 patents. On November 29, 2000, a Special Master was appointed to aid the district court with construction of disputed claim terms in accordance with Markman. On February 5, 2001, the Special Master issued a report construing twelve disputed claim terms. The report was adopted in its entirety by the district court on February 13, 2001. On June 4, 2001, Picanol filed a motion in limine, based on Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 234 F.3d 558 (Fed. Cir.2000) (en banc) ("Festo I"), to preclude Sulzer from introducing evidence of infringement under the doctrine of equivalents due to prosecution history estoppel. On September 10, 2001, a jury trial commenced. Prior to the conclusion of the jury trial, the district court issued an order granting Picanol's motion in limine. The court also entertained requests for jury instructions and made rulings on those requests. In one of the jury instructions, the district court incorrectly referred to the manufacture, not the operation, of Picanol's machines. The jury instructions contained no discussion of the district court's claim construction rulings. On September 25, 2001, the jury was charged, deliberated, and returned a verdict of non-infringement in favor of Picanol as to both patents-in-suit. On October 10, 2001, Sulzer filed a motion for a new trial based on the two asserted errors in the jury instructions. Sulzer's motion was denied on April 19, 2002. Sulzer preserved its right to appeal the jury instruction issues, and Picanol does not challenge that right. At the conclusion of the proceedings before the district court, Picanol moved for attorneys' fees under 35 U.S.C. § 285. The district court denied Picanol's fee motion.
 
 
 19
 Sulzer appeals from both the order denying its motion for new trial and the order granting Picanol's motion in limine. Picanol cross-appeals from the district court's order denying its motion for attorneys' fees. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (2000).
 
 DISCUSSION
 I. Standard of Review
 
 20
 In this appeal, we are faced with the question of whether to apply Federal Circuit or Fifth Circuit law to a number of the issues raised by the parties. We answer this question on an issue by issue basis and will apply the law of the regional "circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law," Molins PLC v. Quigg, 837 F.2d 1064, 1066 (Fed. Cir.1988) (citations omitted), in which case, we will apply our own law to both substantive and procedural issues "intimately involved in the substance of enforcement of the patent right." Viam Corp. v. Iowa Exp.-Imp. Trading Co., 84 F.3d 424, 428 (Fed. Cir.1996).
 
 
 21
 The denial of a motion for a new trial is a procedural issue not unique to patent law, and thus, we apply the law of the regional circuit — here the Fifth Circuit. See WMS Gaming Inc. v. Int'l Game Tech., 184 F.3d 1339, 1361 (Fed. Cir.1999). In the Fifth Circuit, "the decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law." Prytania Park Hotel v. Gen. Star Indem. Co., 179 F.3d 169, 173 (5th Cir.1999) (citations omitted).
 
 
 22
 The question of whether a jury instruction on an issue of patent law is erroneous is a matter of Federal Circuit law and is reviewed de novo. Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir.2000). A jury verdict will be set aside, based on erroneous jury instructions, if the movant can establish that "those instructions were legally erroneous," and that "the errors had prejudicial effect." Id. at 1281; see also Ecolab Inc. v. Paraclipse, Inc., 285 F.3d 1362, 1373 (Fed. Cir.2002). In reviewing jury instructions, the full trial record and the jury instructions in their entirety must be examined because "instructions take on meaning from the context of what happened at trial, including how the parties tried the case and their arguments to the jury." Hilton Davis Chem. Co. v. Warner-Jenkinson Co., 62 F.3d 1512, 1522 (Fed. Cir.1995), rev'd on other grounds, 520 U.S. 17 (1997).
 
 
 23
 Because "[e]videntiary rulings ... are not unique to our jurisdiction, ... we review them under the law of the [regional circuit]." Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc., 265 F.3d 1294, 1308 (Fed. Cir.2001). The Fifth Circuit reviews such evidentiary rulings for abuse of discretion. See Snap-Drape, Inc. v. Comm'r, 98 F.3d 194, 197 (5th Cir.1996). However, where a district court rules, as a matter of patent law, that a party is precluded from introducing evidence, we apply Federal Circuit law and review the district court's ruling de novo. K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1367 (Fed. Cir.1999); Winner Int'l Royalty Corp. v. Wang, 202 F.3d 1340, 1345 (Fed. Cir.2000).
 
 
 24
 In an appeal regarding a denial of a motion for attorneys' fees under 35 U.S.C. § 285, this court, applying Federal Circuit law, reviews de novo whether the district court applied the proper legal standard to the case and reviews for clear error the district court's factual findings. Pharmacia & Upjohn Co. v. Mylan Pharms., Inc., 182 F.3d 1356, 1358-59 (Fed. Cir.1999). If the district court applied the correct legal standard and did not clearly err in its factual findings in making its determination that a case is exceptional, we then review the court's decision whether or not to award attorneys' fees under an abuse of discretion standard. Id.
 
 II. Motion for a New Trial
 
 25
 In contesting the district court's denial of its motion for a new trial, Sulzer takes issue with two aspects of the district court's jury instructions. First, Sulzer contends that the district court's instruction regarding the standard for infringement was legally erroneous. In instructing the jury, the district court stated that Sulzer must show that Picanol "has manufactured its weaving machines using a process which includes all steps of [the claims]." (emphasis added). Sulzer argues that this instruction is wrong because the claims of the patents-in-suit are not directed to the manufacture of weaving machines but to the methods of operation of the weaving machines. Second, Sulzer asserts that the district court committed legal error by failing to give the jury any instruction on claim construction. We address each of these arguments in turn.
 
 A. The Incorrect Instruction
 
 26
 Sulzer first argues that the district court's instruction requiring Sulzer to show that Picanol "manufactured" its weaving machines according to the claims was incorrect. Sulzer also argues that the incorrect instruction was prejudicial, because Sulzer could not have anticipated that it would have to prove how Picanol manufactured its weaving machines and, therefore, only presented evidence on how the machines operated. Because no evidence was submitted on how the machines were manufactured, and because the claims recite methods of operation of the machines and not methods of manufacturing, Sulzer asserts that the jury was confused by the erroneous instruction. It offers as proof the fact that the jury returned a verdict in Picanol's favor after only a short period of deliberation. Picanol argues that the jury instructions, when considered as a whole and in the context of the trial, were not prejudicially erroneous, because the jury would have understood that the incorrect reference in the instruction to the manufacture, rather than the operation, of the accused machine, was apparent from the trial and from the rest of the instructions. We agree with Picanol.
 
 
 27
 The parties agree that the claims of the patents-in-suit are not directed to the process of manufacturing machines. However, it is not enough to merely show that a jury instruction is erroneous; Sulzer also must show that the erroneous jury instruction was prejudicial. Advanced Display Sys., Inc., 212 F.3d at 1281. When the error in a jury instruction "could not have changed the result, the erroneous instruction is harmless." Environ Prods., Inc. v. Furon Co., 215 F.3d 1261, 1266-67 (Fed. Cir.2000); Weinar v. Rollform Inc., 744 F.2d 797, 808 (Fed. Cir.1984) (defining "prejudicial" error in context of jury instruction as one that is not "harmless"). To determine whether the erroneous jury instruction was prejudicial, the entirety of the proceedings, including the jury instructions as a whole, must be considered. See Delta-X Corp. v. Baker Hughes Prod. Tools, Inc., 984 F.2d 410, 415 (Fed. Cir.1993).
 
 
 28
 The burden of establishing prejudice falls on Sulzer. See Ecolab, 285 F.3d at 1374. Sulzer offers only the statement that "it is virtually certain that the jury arrived at the verdict of non-infringement because it heard no [evidence of Picanol's manufacturing] and concluded that Sulzer failed to meet its burden." In reaching this conclusion, Sulzer places heavy reliance on the fact that the jury deliberated for only three hours. But Sulzer's argument ignores the entirety of the trial proceedings. The testimony at trial, as well as all of the jury instructions on infringement but the one erroneous instruction in question, were directed to the method of operation of Picanol's machines and the extent to which Sulzer's patent claims read on that method of operation, applying the correct standard for infringement. Specifically, the district court's jury charge correctly recited that "Sulzer contends that Picanol supplies, operates, and causes the operation of Delta, Omni, and Omni-Plus air-jet weaving machines incorporating the ... methods that are covered by the patents." Further, the jury was instructed correctly that "[t]o determine infringement, you must compare the process carried out by [the methods used in Picanol's machines to] each claim that Sulzer asserts is infringed." The jury also was instructed correctly to examine "the process carried out in these machines accused of infringement;" to consider that "[p]rocess claims are not infringed by the mere existence of a device;" and to understand that "[a] person is said to be infringing the process claim of a patent when he, without permission from the patent owner, uses the patented process as defined by the claims." Sulzer and Picanol submitted evidence throughout trial relating solely to the operation of Picanol's machines, not their manufacture.
 
 
 29
 We conclude that the single mistaken reference in the jury instructions to the manufacture of Picanol's machines was an error that was apparent and not prejudicial. The jury instructions, viewed in their entirety and considered in the context of the trial as a whole, presented the correct legal standard for infringement to the jury. Sulzer's speculative and conclusory argument is not sufficient to establish that, had the one misstatement not been part of the instructions, the result of the case would have been different. Therefore, we conclude that, to the extent the noted jury instruction was erroneous, the error was harmless.
 
 B. The Missing Instruction
 
 30
 In this case, the district court did not read the court's claim constructions to the jury or instruct the jury that the claims, as construed, were to be applied against the alleged infringing machines. Sulzer argues that because the district court failed to give the jury any guidance about the district court's claim constructions, the jury was free to adopt any interpretation of the claim language. Sulzer thus contends that the absence of these instructions was prejudicial.
 
 
 31
 Picanol argues that the district court is not required to recite every claim construction or engage in an "exercise in redundancy," citing United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir.1997). Picanol argues that the claim constructions rendered by the district court before the trial began shaped the testimony throughout trial. According to Picanol, any confusion by the jury as to the appropriate meaning of the claim terms was invited by Sulzer. Picanol also contends that Sulzer has failed to set forth any evidence of prejudice. We conclude that the district court erred in omitting from its jury charge any instructions on claim construction, but we find that such error, in this case, was harmless.
 
 
 32
 This court has long joined other circuits in holding that one "duty of a trial court in any jury trial is to give instructions which are meaningful, not in terms of some abstract case, but which can be understood and given effect by the jury once it resolves the issues of fact which are in dispute." Structural Rubber Prods. Co. v. Park Rubber Co., 749 F.2d 707, 723 (Fed. Cir.1984) (citing Choy v. Bouchelle, 436 F.2d 319 (3d Cir.1970); Marshall v. Isthmian Lines, Inc., 334 F.2d 131, 138 n. 15 (5th Cir.1964)). Jury instructions are reviewed not only for accuracy, but for clarity, objectivity, and adequacy, taken as a whole. See U.S. Surgical, 103 F.3d at 1564; Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1570 (Fed. Cir.1992) ("The correctness of a jury instruction ... is reviewed on appeal to determine whether, on the whole, the jury instructions were adequate to ensure that the jury fully understood the legal issues for each element of the case."). The meaning and scope of patent claim terms, as determined by a district court's claim construction rulings, are legal issues central to most patent cases. Thus, the district court normally will need to provide the jury in a patent case with instructions adequate to ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.
 
 
 33
 The Markman decisions, in ruling that claim construction is a matter of law for the court, do not hold that the trial judge in a patent case must repeat or restate every claim term in the court's jury instructions. U.S. Surgical, 103 F.3d at 1568. The district court simply must give the jury guidance that "can be understood and given effect by the jury once it resolves the issues of fact which are in dispute." Structural Rubber Prods., 749 F.2d at 718. This means that, as to claim coverage, the district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to "intelligently determine the questions presented." Shad v. Dean Witter Reynolds, Inc., 799 F.2d 525, 532 (9th Cir.1986).
 
 
 34
 Although the particular form and precise nature of jury instructions are matters within the sound discretion of the district court, see Ballard Medical Products v. Allegiance Healthcare Corp., 268 F.3d 1352, 1358 (Fed. Cir.2001), the trial court in a patent case must at minimum take steps to assure that the jury understands that it is not free to consider its own meanings for disputed claim terms and that the district court's claim construction, determined as a matter of law, is adopted and applied by the jury in its deliberation of the facts. It is not enough that the testimony and argument at trial is consistent with the district court's construction of disputed claim terms. The jury must be told that the court has made a claim construction ruling that the jury must follow and cannot be left free to apply its own reading of disputed terms to the facts of the case. "An instruction should be given to the jury on every material issue." 9 Wright & Miller, Federal Practice and Procedure § 2556, at 448 n. 29 (1995) (citing Gillentine v. McKeand, 426 F.2d 717, 723 (1st Cir.1970)). Accordingly, we hold that it is the duty of trial courts in patent cases in which claim construction rulings on disputed claim terms are made prior to trial and followed by the parties during the course of the trial to inform jurors both of the court's claim construction rulings on all disputed claim terms and of the jury's obligation to adopt and apply the court's determined meanings of disputed claim terms to the jury's deliberations of the facts.
 
 
 35
 In the present case, the district court remarked that "[i]n this suit, the constructed terms were not in dispute at trial." The district court cited U.S. Surgical, 103 F.3d at 1567, for the proposition that "[w]e doubt that Markman requires the trial judge to instruct as to an undisputed `claim construction' for every term." Order at 3-4. As such, the district court found no error and denied Sulzer's motion for a new trial. Id. In so holding, the district court made two errors. First, the district court misapprehended our precedent in U.S. Surgical in concluding that no claim construction jury instruction is needed whenever claim terms are not in dispute at trial. In U.S. Surgical, the claim terms were not disputed by the parties at any point in the proceedings. The claim terms in that case were understood throughout the case as having their plain meaning. U.S. Surgical held that when the parties do not dispute that the words of the claims simply mean what they say, the district court is not required to add an additional layer of complexity by "constructing" the words of the claim merely to reiterate those words in a jury instruction. In this case, however, the meanings of several claim terms were in dispute and were only resolved by the district court's Markman rulings. The "plain meaning" recognized and not disputed to apply in U.S. Surgical was not present in this case, at least with respect to the disputed terms resolved by the court's claim construction rulings. While it is true that, by the time of trial, the disputed meaning of the claim terms had been determined, that does not change the fact that the meaning of the claim terms was not apparent, was disputed by the parties, and was resolved only by the court's claim construction rulings.
 
 
 36
 Second, because the district court made specific claim construction rulings, it was required to inform the jury that it was not free to consider its own meanings for the disputed terms but must apply the district court's construction of the terms in its deliberations. The failure of the district court to inform the jury of the court's claim construction and to instruct the jury of its obligation to apply that construction in its infringement deliberations left the jury free to make its own determination of the meaning of the claims and was error.
 
 
 37
 Having shown error, Sulzer must also establish that the error was prejudicial. Prejudicial error exists if the outcome of the case would have been different had the correct instruction been given. Environ Prods., 215 F.3d at 1266-67. Upon examination of the entirety of the proceedings, we conclude that Sulzer has not met this burden. The evidence presented at trial reflected the court's claim construction. For example, one of Sulzer's experts, Dr. Adanur, specifically testified about a claim chart and stated that the rephrased claim language set forth in the chart was determined by the district court. The evidence that Sulzer points to as being contrary is the testimony of Picanol's witness, Mr. Shefte. In particular, Sulzer contends that Mr. Shefte paraphrased a claim term on direct examination, and on cross-examination, Mr. Shefte was shown a demonstrative exhibit showing the jury both the court's claim constructions and the claim constructions set forth in Mr. Shefte's expert report. Further, Sulzer makes a brief argument that contrary claim construction testimony also came in through the testimony of Sulzer's own expert, Dr. Adanur. Thus, the evidence that Sulzer presents as being contrary to the district court's claim constructions, and thus, confusing to the jury, is largely testimony that Sulzer itself elicited, and was de minimis compared to the testimony that properly communicated the court's claim construction. See, e.g., Chem. Eng'g Corp. v. Essef Indus., Inc., 795 F.2d 1565, 1572 (Fed. Cir.1986) (precluding party from complaining about "invited error" on appeal); Weinar, 744 F.2d at 805 (upholding the district court because, inter alia, appellant's argument "disregards the `invited error' rule in that much of the testimony now objected to was elicited by [appellant's] counsel on cross examination."). Because the district court's claim constructions were reflected in the testimony at trial, and because any testimony to the contrary was "invited error" by Sulzer, we have no basis to conclude that, had the district court instructed the jury on its claim construction rulings and on the jury's obligation to apply the district court's claim constructions to the facts, the result of the case would have been different. To the extent that the jury instructions were erroneous, Sulzer has failed to establish prejudice flowing from those errors. Therefore, we affirm the district court's denial of Sulzer's motion for a new trial.
 
 III. Motion in Limine
 
 38
 Sulzer argues that the district court legally erred in precluding it from introducing evidence of infringement under the doctrine of equivalents. In particular, Sulzer argues that the district court's In Limine Order was based on this court's decision in Festo I, which, subsequent to the trial and the denial of Sulzer's motion for a new trial, was vacated and remanded by the Supreme Court. See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 122 S.Ct. 1831 (2002) ("Festo II"). Sulzer asserts that the district court's ruling on the motion in limine prohibited Sulzer from introducing evidence of equivalents based on precedent which has now been vacated by the Supreme Court. Picanol contends that Sulzer deliberately chose not to introduce evidence of equivalents and waived any claim of infringement under the doctrine of equivalents. Alternatively, Picanol argues that, even under Festo II, Sulzer fails to meet its burden of overcoming the presumption that it surrendered subject matter in prosecuting the patents-in-suit.
 
 
 39
 In Festo I, the Federal Circuit barred resort to the doctrine of equivalents for claim limitations that were narrowed by amendment during prosecution. The Supreme Court, in Festo II, vacated the complete bar based on narrowing amendments and instead held that a narrowing amendment for a reason related to patentability raises a presumption of prosecution history estoppel that may be rebutted by the patentee on stated grounds. Festo II thus represented a change of law, subsequent to the district court's In Limine Order and final judgment in this case. In these circumstances, it is the new law that governs the appeal. See, e.g., Thorpe v. Hous. Auth. of Durham, 393 U.S. 268, 282 (1969) (noting that "if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed").
 
 
 40
 Picanol makes an unconvincing argument that the In Limine Order was not based on Festo I and that the intervening change in law is irrelevant. Although the order of the district court provides no reasoning behind its grant of Picanol's motion in limine, the parties' briefing indicates that Festo I was the driving factor. The opening paragraph in Picanol's motion in limine states that Picanol seeks to preclude Sulzer from arguing infringement under the doctrine of equivalents, citing only Festo I and its complete bar. The remainder of Picanol's motion is equally centered on the analysis at the heart of Festo I.
 
 
 41
 It is apparent, then, that the district court's In Limine Order was, at least in part if not entirely, based on law that has since changed. That leaves as the main point of dispute whether Sulzer waived recourse to the doctrine of equivalents by failing to produce evidence of equivalents at trial. According to Picanol, Sulzer simply failed to raise equivalents in its case-in-chief and the district court properly refused Sulzer's efforts to raise it belatedly during cross-examination. Picanol further argues that Sulzer's failure to produce evidence of equivalents was a strategic choice, rather than a result of an adverse evidentiary order, pointing out that the In Limine Order was not issued until September 24, 2001 — two weeks after the trial commenced and only one day before the close of evidence. Sulzer counters by arguing that it did not waive recourse to the doctrine of equivalents and presented no evidence only because the district court informed counsel, off the record prior to trial, that it was going to preclude recourse to the doctrine of equivalents.
 
 
 42
 The docket sheet in this case records the pretrial conference but does not contain any record of any ruling by the court on Picanol's motion in limine. However, there is evidence that the district court had indeed decided to foreclose resort to the doctrine of equivalents — even if it had not formally ruled — before the trial even started, leaving the entering of the September 24, 2001 In Limine Order a ministerial task. In a Joint Final Pretrial Order, dated September 7, 2001, Picanol's motion in limine is not listed among the motions then pending. This suggests that the motion had already been decided. Further, during Sulzer's questioning at trial of its expert, Dr. Adanur, about equivalents, counsel for Picanol objected, stating "Objection, Your Honor, for the reasons previously stated." Yet, in the colloquy preceding this objection, no reasons are mentioned. This leads to a reasonable inference that Picanol knew that the district court had disposed of the motion in limine, even before issuance of the In Limine Order. Prior to the court's ruling on the objection, Sulzer withdrew the question, lending further support to the conclusion that the district court already had ruled to foreclose recourse to the doctrine of equivalents. The force of Picanol's argument that the In Limine Order was granted because Sulzer failed to introduce evidence of equivalents during its case-in-chief is diminished by the fact that had Sulzer simply elected not to present evidence of equivalents at trial, Picanol's motion in limine could have been dismissed as moot. The granting of Picanol's motion indicates that it was decided before it was moot, consistent with Sulzer's argument that it was resolved before the trial began. All of these points collectively support Sulzer's argument that it had not waived the issue of infringement under the doctrine of equivalents.
 
 
 43
 Sulzer and Picanol raise additional arguments as to whether or not there is a basis to overcome the presumption of prosecution history estoppel in this case. Based on the district court's one-paragraph In Limine Order, we are without sufficient facts to rule on these arguments and leave for the district court in the first instance the question of infringement under the doctrine of equivalents, including the determination of any limitations on resort to the doctrine of equivalents based on prosecution history estoppel.
 
 
 44
 Because we conclude that Sulzer did not waive its assertion of infringement under the doctrine of equivalents, and because the intervening change in law may have affected Sulzer's rights, we vacate the district court's In Limine Order and remand the issue of the doctrine of equivalents for consideration consistent with Festo II and our precedent following Festo II.
 
 IV. Motion for Attorneys' Fees
 
 45
 On cross-appeal, Picanol argues that the district court erred in denying its motion for attorneys' fees. Picanol specifically argues that the district court erred in determining that the case was not "exceptional." Picanol claims that this conclusion is in error, because the district court found substantial evidence regarding Sulzer's unreasonable behavior in filing suit but disregarded the evidence and failed to draw the conclusions compelled by the evidence. Sulzer counters that the district court did not err and further asserts that Picanol waived its claim for attorneys' fees for failure to include the request in the Final Pretrial Order.
 
 
 46
 Sulzer's argument that Picanol waived its claim for attorneys' fees is simply untenable. At the pretrial stage, there is no prevailing party, and thus, any claim for attorneys' fees would be premature. Cf. Brasseler, U.S.A. I, L.P., v. Stryker Sales Corp., 182 F.3d 888, 892 (Fed. Cir.1999) (rejecting an argument that a claim for attorney fees was waived by failing to raise such a claim in a successful summary judgment motion, holding that "until the `prevailing party' is known, a party that has pled a claim for attorneys' fees under Section 285 cannot be expected to request such fees"). Picanol's claim for attorneys' fees was properly before the district court, and the denial of that request is now properly before us for review.
 
 
 47
 An award of attorneys' fees under § 285 follows a two-step analysis. Cybor Corp., 138 F.3d at 1460. The court first determines whether the case is "exceptional," and, if so, then determines whether an award of attorneys' fees is appropriate. Id. The district court in this case ended its analysis at the first step, concluding that "[t]his case does not rise to the status of `exceptional.'" Fee Order at 9.
 
 
 48
 Picanol argues that the district court erred by applying the wrong legal standard for determining whether a case is exceptional and, further, failed to make critical findings of fact. With respect to the legal standard, Picanol asserts that the district court based its conclusion solely on grounds of "wrongful intent or gross negligence," without considering other bases, such as frivolousness. This argument is without merit, because the district court did indeed consider all applicable bases. The district court directly addressed Picanol's claims "that Sulzer demonstrated its bad faith by pursuing a suit that it knew, or should have known on reasonable investigation was baseless." Id. at 3. The district court reasoned that, because Sulzer's claims survived Picanol's motion for summary judgment, Sulzer's claims could not be considered baseless. Id. at 3-4 (citing Beckman Instruments, Inc. v. LKB Produckter AB, 892 F.2d 1547, 1551 (Fed. Cir.1989), for the proposition that it is difficult to conceive of a "baseless" claim that survived summary judgment). Because the district court did consider the appropriate bases for finding a case exceptional, we find no error in the legal standard applied by the district court.
 
 
 49
 Picanol's second argument, that the district court failed to make critical findings of fact, is more aptly characterized as an assertion that, in the face of the evidence, the district court made the wrong decision. Because the district court applied the correct legal standard, the remainder of the determination of whether a case is exceptional is a factual determination reviewed for clear error. Cybor, 138 F.3d at 1460. The district court's Fee Order is well-reasoned and thorough. Picanol's argument to the contrary seeks only to have us decide the merits of the case anew, which we decline to do. Because the district court applied the correct legal standard and did not commit clear error in its factual determination that the case is not exceptional, the district court's Fee Order is affirmed.
 
 CONCLUSION
 
 50
 Because Sulzer fails to provide evidence of prejudice as a result of any error in the jury instructions, we affirm the district court's denial of Sulzer's motion for a new trial. Further, because the district court applied the correct legal standard and did not otherwise clearly err, we also affirm the district court's denial of Picanol's motion for attorneys' fees. However, because the district court erred as a matter of law in precluding Sulzer from presenting evidence of infringement under the doctrine of equivalents and because of the intervening change in the law in Festo II, we vacate the district court's grant of Picanol's motion in limine and remand the issue of infringement under the doctrine of equivalents to the district court for further proceedings.
 
 
 51
 AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.
 
 COSTS
 
 52
 No costs.