**3M INNOVATIVE PROPERTIES COMPANY and Dyneon LLC, Plaintiffs/Counterclaim Defendants,**

v.

**DUPONT DOW ELASTOMERS LLC, Defendant/Counterclaim Plaintiff.**

**No. CIV. 03–3364MJDJGL.**

United States District Court,
D. Minnesota.

March 8, 2005.

John C. Adkisson & Juanita R. Brooks, Fish & Richardson P.C., and R.J. Zayed, Carlson, Caspers, Vandenburgh & Lindquist, Minneapolis, MN, and Kevin H. Rhodes, 3M Innovative Properties Company Office of Intellectual Property Counsel, St. Paul, MN, for Plaintiffs & Counterclaim Defendants 3M Innovative Properties Company and Dyneon LLC.

Richard M. Dahl, Madigan, Dahl & Harlan, P.A., Minneapolis, MN, and Thomas Kenworthy, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Defendant/Counterclaim Plaintiff Dupont Dow Elastomers LLC.

## MEMORANDUM & ORDER

DAVIS, District Judge.

## I. INTRODUCTION

This case involves claims for patent infringement, false advertising, and deceptive trade practices involving, broadly speaking, polymer processing techniques.[1] More specifically, the patented invention comprises the use of a multimodal fluoropolymer as a polymer processing additive thereby improving the melt processability of thermoplastic polymers, and in turn, the manufacturing efficiency of plastic items. U.S. Patent No. 6,277,919, C. 2, l. 64–C. 3, l. 10; C. 4, ll. 13–22. The case is before the Court on the parties' Motions for Summary Judgment or other relief, as follows:

1. Defendant Dupont Dow Elastomer's Motion for Construction of Additional Claim Terms;

2. Defendant Dupont Dow Elastomer's Motion for Summary Judgment on Plaintiffs' False Advertising and Deceptive Trade Practices Claims; and,

3. Plaintiffs' Renewed Motion for Summary Judgment on Dupont Dow Elastomers' Inequitable Conduct Defense; or in the Alternative for a Bench Trial.

## II. FACTUAL BACKGROUND

This case was filed on June 6, 2003, alleging one count of infringement of the '919 Patent. Defendant Dupont Dow Elastomers ("Dupont Dow") answered, denied the infringement allegations, and asserted defenses. The Complaint was amended on June 4, 2004 to add one count for false advertising under the Lanham Act, 15 U.S.C. § 1125(a); and one count for deceptive trade practices under Minn. Stat. § 325D.44. On January 13, 2005, the United States Patent Office granted Dupont Dow's Request for Reexamination of the '919 Patent.

The '919 Patent was issued to Plaintiff Dyneon LLC on August 21, 2001. Plaintiff 3M is the exclusive licensee of the '919 Patent. (Complaint, Docket No. 1). The Plaintiffs are referred to collectively as Dyneon. The parties are competitors in the manufacture and sale of polymer processing aids. (Id.)

In June, 2004, Dupont Dow moved for summary judgment on its non-infringement defense after the parties completed some fact discovery and exchanged expert reports. Dyneon cross-moved for summary judgment on Dupont Dow's defenses of anticipation, indefiniteness, and inequitable conduct.

The Court[2] recognized that Dupont Dow's indefiniteness defense depended on the construction of the terms "multimodal" and "melt flow index" from Claim 1 of the '919 Patent. (Sept. 25 Order at 4). The Court granted Dyneon's motion for summary judgment on Dupont Dow's indefiniteness defense because the specification definition of "multimodal" eliminated any indefiniteness. (Id. at 7–9).[3] In addition, the Court granted Dyneon's summary judgment motion on Dupont Dow's anticipation defense, denied Dupont Dow's summary judgment motion of non-infringe-

---

1. Defendant–Counterclaim Plaintiff Dupont Dow Elastomers has also brought an antitrust counterclaim for violation of Section 2 of the Sherman Act, but the parties agreed to stay proceedings on that claim pending resolution of the patent infringement claims. July 6 Joint Stipulation [Docket No. 114].

2. Until October 8, 2004, this case was assigned to the Honorable Judge Magnuson of this District. The parties' first round of summary judgment motions was thus heard and decided by Judge Magnuson.

3. "[M]ultimoldal means that the fluoropolymer has at least two components of discrete and different molecular weights." '919 Patent, C. 3, ll. 13–15.

ment, and denied Dyneon's motion for summary judgment on Dupont Dow's inequitable conduct defense. (*Id.* at 9–17).

Dyneon has now renewed the Motion for summary judgment on the inequitable conduct defense; Dupont Dow seeks summary judgment on the false advertising and deceptive trade practices claims; and, Dupont Dow moves the Court for construction of some additional claim terms.

## III. DISCUSSION

### A. *The Motion for Construction of Additional Claim Terms.*

Dupont Dow seeks the Court's construction of non-claim terms, namely **"discrete," "different," "component," "low,"** and **"high,"** and claim terms, namely **"fluoropolymer," "thermoplastic," "component A"** or **"component B,"** and **"effective amount of the processing additive composition."** Dyneon objects, arguing that Dupont Dow's Motion is untimely because claim construction was completed in connection with the earlier summary judgment motions, (Dyneon's Opp'n Br. at 3–4), while Dupont Dow contends that Dyneon failed to disclose in discovery the constructions it proposes now. Dyneon also contends that Dupont Dow is not seeking "claim construction," as that term is used in *Markman* and its progeny, but seeks constructions for words used within the construed claim terms "multimodal" and "melt flow index." (*Id.* at 1, 6). The Court will address these arguments, as necessary, in connection with the proposed constructions below.

### 1. Claim Construction Standards.

Interpretation of the terms used in a patent is a matter of law to be decided by the Court. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The *Markman* hearing is held to construe the meaning of claim language as a matter of law, not to make factual findings. The Court need only construe the disputed claim language "to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. American Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed.Cir.1999).

When interpreting the claims of a patent, the Court begins with the ordinary meaning of claim terms. *See Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed.Cir.2002). Claim terms are assigned their ordinary and accustomed meaning as understood by one of ordinary skill in the art. *Id.* Dictionaries, encyclopedias, and treatises can be useful resources to assist courts in determining the ordinary and customary meanings of claim terms. *Id.* When interpreting claim language, the Court must also look to the intrinsic evidence of record: the claims, the specification, and the prosecution history. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). The specification is the single best guide to the meaning of a disputed term, and may act as a dictionary defining a term expressly or by implication. *Id.*

### 2. Proposed Constructions.

### a. *"Thermoplastic" and "Effective Amount of the Processing Additive Composition."*

These two terms are used in asserted Claim 20, and "thermoplastic" is used in asserted Claim 17. Dupont Dow and Dyneon agree on the proposed constructions for both terms. (Dyneon's Opp'n Br. at 16). The proposed construction for **"thermoplastic"** is "capable of softening or fusing when heated and of hardening again when cooled." The proposed construction for **"effective amount of the processing additive composition"** is "that which either (a) reduces the occurrence of melt defects occurring during extrusion of the

host polymer below the level of melt defects occurring during the extrusion of·a host polymer that does not employ the multimodal fluoropolymer-based · processing additive composition of the invention, or (b) delays the onset of the occurrence of ·such defects to a higher extrusion rate (that is a higher shear rate)."

The proposed constructions for these claim terms are consistent with the ordinary meaning of the term to one of skill in the art ("thermoplastic"), or comport with the intrinsic evidence. *See* '919 Patent, c. 4, ll. 22–30 (defining "effective amount" as used in the specification and claims). Both terms are used in asserted claims, but may not be readily understood by a jury. The Court therefore adopts the proposed constructions for the claim terms **"thermoplastic"** and **"effective amount of the processing additive composition"** that are set out above.

### b. "Fluoropolymer."

█ "Fluoropolymer" is used in asserted Claim 1. It also is used as part of the construction of the claim term "multimodal." The parties agree that the proper construction of **"fluoropolymer"** is a "polymer based on fluorine replacement of hydrogen atoms in hydrocarbon molecules." (Dyneon's Opp'n Br. at 15–16). However, in contrast to the agreed constructions for the preceding claim terms, Dyneon urges the Court not to construe "fluoropolymer" because Dupont Dow "has already admitted that the accused product is a fluoropolymer[.]" (*Id.* at 15). Dupont Dow responds that agreement on the presence of a claim element in the accused product does not obviate the Court's responsibility for claim construction, particularly since "fluoropolymer" is a central claim term in the infringement and invalidity cases. (Dupont Dow's Rep. Br. at 6).

█ Dyneon argues that agreement on the presence of a claim element precludes

the need for construction of the term, citing *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356 (Fed.Cir.2004) (Dyneon's Opp'n Br. at 16). The *Sulzer* court's opinion offers insight into the necessity of claim construction where the meaning of claim terms is undisputed, *see* 358 F.3d at 1366, but it does not hold that agreement on the presence of a claim element precludes construction of the claim term. The Court recognizes that *Markman* does not require the trial judge to "repeat or restate every claim term in the court's jury instructions." *Id.* Yet the Court's fundamental duty in a patent case is to provide the jury with instructions "adequate to ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims." *Id.* In that context, the Federal Circuit has held that district courts "may—indeed, often must—interpret or define a term in the claims that is not in dispute in order to provide a proper context for the discussion of the terms that are in dispute." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1353 (Fed.Cir.2003).

Here, "fluoropolymer" is a claim term. The Court does not assume that the meaning of "fluoropolymer" will be automatically obvious to the jury even with the benefit of expert or other testimony at trial, particularly since this term will crop up repeatedly in the infringement and the invalidity cases. The Court therefore adopts the proposed construction for **"fluoropolymer"** as a **"polymer based on fluorine replacement of hydrogen atoms in hydrocarbon molecules"** notwithstanding the parties' agreement.that this claim element is found in the accused products. Doing so will simply facilitate the jury's understanding of the technical terms that will be used repeatedly at the trial with respect to disputed issues.

### c. "Component A" and "component B" Along with "component," "low," and "high."

"Component A" and "component B" are used in asserted Claim 1 ("a multimodal, fluoropolymer having a Component A with a melt flow index ($MFI_a$) and Component B with a melt flow index ($MFI_b$)"). These terms are also used in the construction for "multimodal." *See* Sept. 25 Order at 5. The terms "component," "low," and "high" are not used separately in the asserted claims (that is, for "component," not apart from the designation "component A" or "component B").

The Court begins with the proposed constructions for "component A" and "component B." Regardless of the parties' disputes over the timing and substance of disclosures, there is a dispute over the proper construction of these claim terms. The Court is therefore obligated to construe these terms. *United States Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed.Cir.1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope . . .").

The parties' proposed constructions for these claim terms are close, with the difference found in the extent to which the specification language is incorporated into that construction. Dupont Dow construes "component A" as "a low molecular weight component." Component B is construed as "a high molecular weight component." (Dupont Dow's Op'g Br. at 6). Dyneon construes "component A" as "the molecular weight component with a relatively high melt flow index." Component B is construed as "the high molecular weight component with a relatively low melt flow index." (Dyneon's Opp'n Br. at 15). Dyneon's proposed construction is drawn verbatim from the specification, '919 Patent, C. 3, ll. 15–19, while Dupont Dow's proposed construction, which is also drawn from the specification, eliminates the clause "relatively high [low] melt flow index."

The Court must also consider whether the terms "component," "high," and "low," require construction. Dupont Dow argues that Dyneon did not provide proposed constructions for these terms in response to an Interrogatory seeking that information (Kenworthy Ex. P at 13–14), nor did Dyneon object to or contest Dupont Dow's proposed constructions when disclosed in discovery. (Kenworthy Ex. Q at 3). Dupont Dow therefore urges the Court to reject any constructions proposed by Dyneon now. (Dupont Dow Rep. Br. at 5). Dyneon argues that it has consistently advocated a common, ordinary meaning for these terms. (Dyneon Opp'n Br. at 9). While it provided no explanation of that meaning, Dyneon argues that it need not do so given the common nature of these words. (*Id.* at 8).

Without commenting on whether Dyneon's mere reliance on "ordinary meaning" is sufficient to fulfill its discovery obligations, the Court does not believe it should bar Dyneon from proposing constructions for terms used in its patent. If Dupont Dow was unaware of what Dyneon meant by "ordinary meaning" it had available the discovery tools and the Court's assistance to remedy that problem.

The more difficult question, however, is whether these terms should be construed. None of these terms are used in the claims, but they are used repeatedly in the specification. *E.g.,* '919 Patent, C. 3, ll. 11–22 (defining "multimodal" as polymer with at least two "components"); C. 3, ll. 53–60 (defining ratio of melt flow index of component A to melt flow index of component B by "low molecular weight" and "high molecular weight"). Dupont Dow believes these non-claim terms are the proper subject of construction because they are "pertinent to the asserted

claims," (Dupont Dow's Rep. Br. at 2), citing the Federal Circuit's decision in *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575 (Fed.Cir.1996). Dyneon argues that the Court need not construe terms that are common, every day words found only in the specification or construction of a claim term, here, "multimodal." (Dyneon's Opp'n Br. at 6).

The Federal Circuit's decision in *Hoechst Celanese* construed a specification term used in the construction of a claim term in order to avoid introducing further complexity to the trial of the case:

> 'Stable' is defined in the body of the specification as turning on the meaning of 'dimension.' Although 'dimension' appears in the specification, not in the claims, implementation of the *Markman* decision appears to require that the meaning of 'dimension' be given the same de novo determination by the Federal Circuit as the meaning of 'stable' in the claims, lest we add further complexities to the trial of patent cases.

78 F.3d at 1578. No other reported decision construing non-claim terms used in the specification has been cited by the parties or located by the Court. Both parties cite decisions in which the Federal Circuit and district courts have either construed common, ordinary terms, *see* Dupont Dow's Rep. Br. at 10; or, have refused to construe common, ordinary terms, *see* Dyneon's Opp'n Br. at 6–8. In all those cases, however, the terms at issue were found in the claims. None of these decisions involved the construction of non-claim terms. In addition, the only conclusion that can be reached from reviewing the cases cited by the parties is that some courts construe an "ordinary term" just as often as other courts refuse to construe "ordinary terms."

The Court does not believe the term "component" requires construction. First, this term is used as part of claim elements, namely "component A" and "component B" and as such those are the terms that require construction. Second, the differences between the parties' proposed constructions for "component" are sufficiently minor that the Court's construction is not necessary to eliminate confusion. Last, the Court agrees with Dyneon that most jurors will understand this term, whether used in the specification or the claims.

In contrast, the parties' dispute over the proper constructions for "low" and "high" suggests that the jury will benefit from some guidance on how those terms are used in the context of construed claim terms. While "low" and "high" may be well-understood in isolation and outside the context of thermoplastic polymer processing techniques, the jury will consider them in the more technically sophisticated context of a "low [or high] melt flow index." Further, the parties' proposed constructions each have problems that require resolution. Dyneon's proposed constructions ("high: greater than low; Low: less than high") do not convey the relationship that Dyneon claims is evident from the patent specification, other than to say that low cannot be high and vice versa. Dupont Dow's proposed constructions, drawn from a general purpose dictionary, introduce "average" as the scale of measurement ("of greater [lesser] degree or amount than average."), a concept that Dyneon correctly points out is not mentioned or implied in the specification.

Based on the intrinsic evidence and the parties' evidence and arguments, the Court adopts the following constructions for "component A" and "component B."

**Component A: The low molecular weight component with a relatively high melt flow index. "High" has its customary meaning of "lesser degree, size, or amount."**

Component B: The high molecular weight component with a relatively low melt flow index. "Low" has its customary meaning of "greater degree, size, or amount."

#### d. "Discrete" and "different."

These terms are not recited in any asserted claim. Dupont Dow seeks their construction, however, because they are used in the Court's earlier construction of the claim term, "multimodal." *See* '919 Patent, c. 3, ll. 13–15 ("multimodal means that the fluoropolymer has at least two components of **discrete and different** molecular weights."). Dupont Dow draws its proposed constructions from a general purpose dictionary. (Dupont Dow Op'g Br. at 5). Dyneon objects to the unnecessary confusion injected into these simple, common words by using these definitions. Thus, Dyneon proposes alternative constructions that boil down the dictionary definitions to their simplest terms. (Dyneon Opp'n Br. at 11–13). In response, Dupont Dow points out that Dyneon's witness used a definition of "discrete" that was different from Dyneon's proposed construction (Dupont Dow Rep. Br. at 7).

The parties' proposed constructions for "discrete" and "different" have, through the briefing, become close ("distinct" vs. "individually distinct; separate from each other;" and, "not the same as" vs. "totally unlike in nature, form, or quality"). These are relatively common terms, and the parties' proposed constructions suggest only slight variations that are better explored through evidence and testimony at the trial. The Court does not believe, at this stage, that failing to instruct the jury on the proper construction of these non-claim terms risks any jury confusion. Thus, the

Court declines to construe these terms at this time.

**B.** *The Motion for Summary Judgment on Dyneon's Claims for False Advertising & for Deceptive Trade Practices.*

#### 1. Background & Relevant Facts.

Dyneon amended its Complaint in June, 2004, after securing the Court's consent, to assert a claim for false advertising under 15 U.S.C. § 1125(a) and for deceptive trade practices under Minn.Stat. § 325D.44. June 4 Order (Docket No. 101). These claims challenge three (3) words used in Dupont Dow's advertising and other promotional materials in which the fluoropolymer used in its polymer processing aids is described as: **"new, rheology-modified."** For example, in promotional literature, Dupont Dow described its Viton FreeFlow Z fluoroelastomers as **"new** to the industry processing aid technology," and a **"new** line of process aids based on **rheology-modified** fluoroelastomers." (Kenworthy Decl., Ex. K, p. 2; *see also id.* at p. 4 ("unique combination of **new, rheology-modified** fluoroelastomer")). It is undisputed that Dupont Dow's fluoroelastomer was "new" only with respect to its use in polymer processing aids, as it had been used for several years in Dupont Dow's rubber products. (Ex. A, Adkisson 11/19 Decl.). Dupont Dow decided, after giving the fluoroelastomer a new designation, not to tell polymer processing customers that the fluoroelastomer had previously been used in rubber products. (Exs. A, B, Adkisson 11/19 Decl.).[4] In addition, it is undisputed that Dupont Dow had not modified the rheology of its fluoroelastomer since the 1980s. (Ex. G at 79–81, Kenworthy 10/1 Decl.).

---

**4.** Dupont Dow considers the identify of the fluoroelastomer used in its polymer process-

ing aid to be a trade secret.

## 2. Summary Judgment Standards.

Summary judgment is proper if there are no disputed issues of material fact on any element essential to the party's claim. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the evidence and inferences reasonably drawn from the evidence in a light most favorable to Dyneon, the non-moving party. *Ott v. Target Corp.*, 153 F.Supp.2d 1055, 1062 (D.Minn.2001).

 This Motion is assessed in the context of the burden Dyneon will bear at trial, which for the claim under Section 1125(a) requires evidence of: (1) a false statement of fact made in a commercial advertisement distributed in interstate commerce, (2) which actually deceived or had a tendency to deceive a substantial segment of the intended audience, (3) which was material in that it was likely to influence purchasing decisions, (4) which has or is likely to injure plaintiff, in the form of lost sales or lost goodwill, and (5) where money damages are sought, actual damages and a causal link between the Defendant's violation and those damages. *See Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1042 (8th Cir.1999); *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998). The same substantive elements are used to judge the deceptive trade practices claim under Minnesota law. *Mulcahy v. Cheetah Learning LLC*, No. Civ. 02–791, 2003 WL 21909570, *6–7, 2003 U.S. Dist. LEXIS 13893, *17 (D.Minn., July 28, 2003), *rev'd on other grounds*, 386 F.3d 849 (8th Cir.2004). Once a properly supported motion for summary judgment is made, Dyneon then bears the burden in opposition of identifying "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment must be granted if Dyneon fails to present facts "sufficient to establish the existence of an element essential to [its] case [and] on which [Dyneon] will bear the burden of proof at trial." *Minneapolis Community Development Agency v. Buchanan*, 268 F.3d 562, 566 (8th Cir.2001) (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548).

Dupont Dow presents three (3) grounds for granting summary judgment on these claims. First, the statements Dyneon challenges are either literally true or not false by implication. Second, there are no disputed facts on the element of materiality. Third, even assuming Dyneon can present triable facts on the above elements, its claim for monetary relief fails due to lack of causation.

## 3. Alleged Falsity of the Challenged Statements.

At issue in Dyneon's false advertising claims is whether Dupont Dow's characterization of its fluoroelastomer as "new, rheology-modified" when used in connection with a polymer processing aid is true or false. Dupont Dow argues that this statement is literally true when one defines "new" as "recently come into use," or "other than the former" (among other definitions) (Dupont Dow Op'g Br. at 6–10, citing *BellSouth Advertising & Publishing Corp. v. Lambert Publishing*, 45 F.Supp.2d 1316 (S.D.Ala.1999)). Dupont Dow argues that the "rheology-modified" representation is also accurate since the fluoroelastomer did in fact have its rheology modified in the 1980s. (*Id.* at 10–14). Dyneon argues that the characterization of the fluoroelastomer as "new," when it is undisputed that the component had been widely available in a different industry for at least a decade is literally false. (Dyneon Opp'n Br. at 13–16). Dupont Dow's efforts to define "new" in order to fit its actions, Dyneon argues, simply highlight the factual disputes that preclude summary judgment. (*Id.* at 14–15). Dyneon also argues

that the context of Dupont Dow's ads do not support a distinction between the rubber products and the polymer processing aids industries. (*Id.*).

▮▮▮▮ The alleged falsity of a challenged advertisement can fall into one of two categories: (1) literal falsity, or (2) implied falsity. *Surdyk's Liquor, Inc. v. MGM Liquor Stores, Inc.*, 83 F.Supp.2d 1016, 1022 (D.Minn.2000). Literal falsity is determined through a two-step process. First, the fact finder must consider whether the advertising conveys an explicit factual message. Second, the fact finder must consider whether that factual message is false. *Id.* (citing *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir.1998)). In the first step, "a court must analyze the message conveyed in full context." *Rhone–Poulenc Rorer Pharms. v. Marion Merrell Dow*, 93 F.3d 511, 516 (8th Cir.1996) (citation omitted).

▮▮▮▮ The claim of implied falsity, in contrast, assumes some truth to the advertising. *See United Indus. Corp.*, 140 F.3d at 1180 (impliedly false claims may be "literally true or ambiguous but [ ] implicitly convey a false impression, are misleading in context, or likely to deceive consumers."). These claims require "proof that the advertising actually conveyed the implied message and therefore deceived a significant portion of the recipients becomes critical," *Id.* at 1182 (citations omit-

ted), typically in the form of consumer or market research or surveys. *Id.* at 1183. There are no surveys or research in the record that address the message conveyed by Dupont Dow's advertising.[5] Dyneon deposed just one Dupont Dow customer, but no testimony was elicited on the customer's understanding or impression of any messages conveyed by the advertising. (Ex. B, Kenworthy 10/1 Decl.). Thus, the Court's analysis for purposes of this element rests solely on the theory of literal falsity.[6]

▮▮▮▮ The parties have submitted several different examples of Dupont Dow's advertising, in the form of brochures, advertising pieces, and scientific papers. (Adkisson 11/19 Decl., Exs. C, E, J). There is virtually no admissible evidence in the record as to how customers might encounter any one of these pieces in the marketplace. In addition, there is little or no evidence on the sophistication level of these customers. While Dupont Dow admits that "it is likely that all customers [of its process aids] have received communications wherein the phrases 'new' and/or 'rheology-modified' have been used to describe the fluoroelastomer constituent" of its process aids, (Ex. W at 4–5, Adkisson 11/19 Decl.), this admission is different from admissible evidence on the type of customer, the sales process, and therefore the full context of the advertising. *See United Indus. Corp.*, 140 F.3d at 1181

---

5. Dupont Dow submitted a customer survey, but it covers only reasons for making purchasing decisions. Fisher Decl.

6. Dyneon also asserted a theory of "false by necessary implication," since "new" falsely suggests that both the fluoroelastomer and the rheology modifications are recent innovations. (Dyneon Opp'n Br. at 16). Some courts recognize a theory of literal falsity by necessary implication. "A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it

had been explicitly stated." *The Clorox Company v. The Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir.2000). Dupont Dow contends that this theory has not been adopted by the Eighth Circuit, but this District has considered the theory. *See Millennium Import Co. v. Sidney Frank Importing Co.*, No. 03–5141, 2004 WL 1447915 at *5–7, 2004 U.S. Dist. LEXIS 11871 at *14–19 (D. Minn., June 11, 2004). Without commenting on the Eighth Circuit's recognition of this theory, as explained *infra*, material factual disputes preclude summary judgment on this claim element.

(considering audio, visual, and print messages as part of context); *Rhone–Poulenc Rorer Pharms.*, 93 F.3d at 516 (message must be determined from full context). The Court cannot, on a motion for summary judgment, parse through the advertisements to discern for itself the message conveyed by that advertising, particularly when there is no evidence as to the circumstances under which customers may encounter these materials.

The Court also cannot accept Dupont Dow's "central factual thesis" that varying definitions of "new" demonstrate the literal truth of its statements. The challenged advertising at issue in *BellSouth Advertising*, the case Dupont Dow relies on for this theory, used "widely distributed" to describe its yellow pages distribution. 45 F.Supp.2d 1316, 1321 (S.D.Ala.1999). The court recognized that wide distribution could be measured geographically or numerically, and "widely distributed" would be truthful under either measure. *Id.* at 1321.

Dupont Dow implies that the change in industry, from the rubber industry to processing aids, was significant enough to warrant the use of "new." (Dupont Dow Op'g Br. at 8–9). In contrast to *BellSouth Advertising*, however, whether the fluoroelastomer component is "new" under different interpretations of that term depends on the customer's viewpoint and the context of the advertising, issues that must be resolved by the jury. Literal falsity is often a fact question reserved for the jury. *See, e.g., Avid Identification Sys., Inc. v. Schering–Plough Corp.*, 33 Fed.Appx. 854 (9th Cir.2002) (reversing summary judgment for defendant on literal falsity where market share representations were sufficiently specific to be quantifiable, and fact issues remained on whether other repre-

sentations were false in context); *The Clorox Co. v. The Proctor & Gamble Commercial Co.*, 228 F.3d 24, 35 (1st Cir.2000) ("We are not required to decide what claim was actually conveyed by the advertisements because we are not factfinders."); *Hot Wax v. Turtle Wax*, 27 F.Supp.2d 1043, 1048 (N.D.Ill.1998) (given conflicting expert, consumer, and industry evidence regarding acceptable definitions and understanding of "wax," and "because we must draw all inferences against the moving party, we find that the disposition of this issue is properly left to the trier of fact."). While some courts have granted summary judgment on literal falsity based on a record devoid of the necessary fact issues, *see Utah Med. Prods. v. Clinical Innovations Assocs.*, 2000 WL 1838586, *4, 2000 U.S.App. LEXIS 31756, *12–13 (Fed. Cir.2000) (noting that district court held that plaintiff failed to offer any admissible proof that Clinical's use of the phrase "sensor-tipped" was literally false.); *Thermal Design, Inc. v. Indoor Courts of Am., Inc.*, 2004 WL 770995, 2004 U.S. Dist. LEXIS 6341 (W.D.Wis., Apr. 9, 2004) (granting summary judgment for defendant where plaintiff failed to offer admissible evidence on the alleged literal falsity of comparative advertising claims), the Court cannot conclude here, after construing the facts and reasonable inferences in a light most favorable to Dyneon, that no reasonable jury would rule in its favor on literal falsity. Dupont Dow's employees admit that the fluoroelastomer was not "new" in terms of date of creation, but contend it was "new" to the processing aid industry. In order to judge the accuracy of that claim, the context of the advertising must be fully considered, and that is a consideration that must be made by the fact finder.[7]

---

7. Dupont Dow had also relied on the theory of "puffing" as a grounds for summary judgment. *See American Italian Pasta Co. v. New*

*World Pasta Co.*, 371 F.3d 387, 391 (8th Cir. 2003). However, it withdrew that theory at

## 4. Materiality.

■ Dyneon must also present admissible evidence sufficient to demonstrate material factual disputes on the element of materiality.[8] Materiality, a separate inquiry from deception, considers "whether the false or misleading statement is likely to make a difference to purchasers. Thus, even when a statement is literally false or has been made with the intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers." *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 312, n. 10 (1st Cir.2002) (citations omitted); *see also Mulcahy v. Cheetah Learning, LLC*, No. 02–791, 2003 WL 21909570 at *7, 2003 U.S. Dist. LEXIS 13893 at *19 (D.Minn., July 28, 2003), *rev'd on other grounds*, 386 F.3d 849 (8th Cir.2004).

■ Where literal falsity is shown, the element of deception can be presumed. *Porous Media Corp. v. Pall Corp.*, 110 F.3d 1329, 1333 (8th Cir.1997). However, the separate element of materiality is not presumed. Dyneon suggests that this court presumes materiality, citing *Surdyk's Liquor, Inc.*, 83 F.Supp.2d at 1022 (Dyneon Opp'n Br. at 22). The *Surdyk's Liquor* court cited to the decision in *Genderm Corp. v. Biozone Labs.*, 1992 WL 220638 (N.D.Ill., Sept. 3, 1992), in which the court applied a materiality presumption. However, in both *Surdyk's Liquor* and *Genderm Corp.*, the courts were considering preliminary injunction motions. In *Genderm Corp.*, importantly, the defendant admitted that its product was falsely labeled. *Id.* at *2. Neither circumstance is present here.

In contrast, in *Mulcahy v. Cheetah Learning LLC*, the district court granted summary judgment on a false advertising claim where the plaintiff presented no evidence of materiality. 2003 WL 21909570 at *7, 2003 U.S. Dist. 13893 at *19 ("Mulcahy's claim must fail because she presents no evidence that the alleged deception is likely to influence any consumer's purchasing decision."). Further, the Eighth Circuit's opinion in *Porous Media*, which upheld the use in a false advertising case of some presumptions upon proof of intentional conduct, referred only to the deception element and not to materiality. *See* 110 F.3d at 1333 ("Instruction No. 19 contains two separate rebuttable presumptions. The first, which we refer to as a presumption of deception ..."). In addition, the *Porous Media* case involved comparative advertising claims, which are not at issue here. *Id.* at 1331.

■ Thus, the court declines to presume materiality in this case and in the absence of that presumption, must consider the evidence of material factual disputes on this element. Dyneon challenges the credibility of the statements in the Affidavit of Dupont Dow witness Fisher, who states that customers' purchasing decisions were based on the performance of the product. But these statements are consistent with the testimony of the single customer deposed in this case, who testified that he wanted information on the product's performance in making a purchasing decision. (Ex. B at 21, Kenworthy 10/1 Decl.). The customer testified that his users "demand the performance, ... so that's the main criteria." (*Id.; see also Id.* at 24: "The main thing [that he considers]

the summary judgment hearing on December 10, 2004. Tr. at 26.

**8.** At the December 10 Motion hearing, Counsel for Dupont Dow represented to the Court that, while not conceding it, the element of deception would not be argued for purposes of summary judgment. Tr. at 18–19. The Court has therefore confined its analysis of this issue to that of materiality.

is performance and cost."). Even Dyneon's Rule 30(b)(6) witness, who testified that he was the most knowledgeable witness regarding the influences on customer purchasing decisions, admitted that no customers had told him that they relied on the "new, rheology-modified" statements in making purchasing decisions. (Ex. C at 39, 61–62, 75–76, Kenworthy 10/1 Decl.). This witness also repeatedly declined to answer questions about customer purchasing decisions because he couldn't "put [himself] in the customer's head[.]" (Ex. C at 37–38, Kenworthy 10/1 Decl.; *see also* *id.* at 24, 29, 47, 50, 82). He could not remember if the one customer he identified had ever referenced the phrase "new, rheology-modified." (*Id.* at 33–34).

Dyneon has pointed to no other competent, admissible evidence in the record that would allow a fact finder to conclude that customers relied on the "new, rheology-modified" statements in making purchasing decisions. Dyneon complains that the trade secret status of Dupont Dow's fluoroelastomer precluded it from asking the "penultimate question," namely whether customers would have bought the product if they knew the "new" claim was false. (Dyneon's Opp'n Br. at 24, n. 6). Dupont Dow points out that Dyneon chose to depose only one customer, and nothing prevented it from asking any customer what factors influenced purchasing decisions; or, even more specifically, whether the representation of the fluoroelastomer as new and rheology-modified influenced any purchasing decision. (Dupont Dow Rep. Br. at 9–10).

The Court agrees with Dupont Dow on this point. Having had the opportunity for discovery, Dyneon's record is devoid of admissible evidence that would allow a reasonable jury to find or to infer that customers relied on the "new, rheology-modified" statements in making purchasing decisions. The Court therefore finds that

summary judgment on the false advertising and deceptive trade practices claims is warranted on the element of materiality.

## 5. Causation.

Even assuming factual disputes on materiality, Dyneon has not met its burden on the element of causation.

█ The Eighth Circuit requires the plaintiff to prove causation in fact in a non-comparative advertising case. "In a suit for money damages where a defendant misrepresented its own product but did not specifically target a competing product, plaintiff may only be one of many competitors, and without proof of causation and specific injury each competitor might receive a windfall unrelated to its own damage." *Porous Media Corp.*, 110 F.3d at 1335–36. While the *Porous Media* court upheld a presumption of causation and injury, it was in the context of comparative advertisements specifically targeting the plaintiff's product. *Id.* at 1331. This case does not involve comparative advertising claims and Dyneon cites no case that allowed a presumption of causation in the absence of such claims.

Further, Dyneon's reliance on the decision in *Heidi Ott A.G.*, 153 F.Supp.2d 1055, to argue that it is not seeking a "windfall" is misplaced. Although the Court applied a presumption of causation in that case, it did so because "Ott's complaint is not a generalized grievance about Target's promotions and advertising. Rather, Ott claims that Target's advertising both directly and indirectly misled consumers to believe that [Defendant's] Liberty Landing dolls and the Dolls of All Nations were manufactured by Ott." *Id.* at 1073. As that court explained, the *Heidi Ott* case was "not a typical false advertising case," in which a defendant falsely advertised characteristics of its products. *Id.* at 1068. Dyneon's complaint is the more typical

false advertising case challenging Dupont Dow's characterizations of its own products.

Dyneon also cites the Eighth Circuit's decision in *EFCO Corp. v. Symons Corp.*, 219 F.3d 734 (8th Cir.2000) to illustrate the evidentiary showing of causation in a false advertising case. In *EFCO*, the Eighth Circuit reiterated that the plaintiff must prove a causal link between its damages and the defendant's wrongful conduct. *Id.* at 740. The plaintiff succeeded with its burden in *EFCO* by presenting evidence of plaintiff's revenue erosion with a nearly identical increase in defendant's revenues, coupled with evidence of lost sales to the defendant. *Id.* Dyneon adopts this analysis and presents evidence of lost customers and sales, its drop in revenues, and Dupont Dow's increase in revenues. (Dyneon Opp'n Br. at 30–31).

 *EFCO* is also distinguishable because it was a comparative advertising case. *Id.* at 738. Even assuming the *EFCO* analysis would apply here and construing Dyneon's evidence in its favor, the Court concludes that a reasonable jury could not find that Dupont Dow's alleged false advertising is the cause of Dyneon's claimed damages. For example, the Expert Report of Dr. Nantell simply calculates damages after assuming that the false advertising caused Dyneon's lost profits; it does not provide any insight into or evidence on causation. (Ex. Y at 7, Adkisson 11/24 Decl.). Similarly, the change in the parties' sales positions is simply that, a change. But it has not been linked to the specific advertising claims challenged here, an critical omission given the many claims made in this advertising. Last, the testimony of Dyneon's witness establishes only the witness' assumption or belief that lost sales can be attributed to Dupont Dow's advertising generally. But this is an insufficient evidentiary basis on which to avoid summary judgment. *See*

*Blue Dane Simmental,* 178 F.3d at 1043 (upholding judgment for defendant where plaintiff's evidence established only "that they believed that their sales had dropped because of the introduction of [defendant's product]."). In sum, Dyneon has not accounted for customer purchasing decisions that were made for reasons other than the challenged advertising. *See BASF v. Old World Trading Co.,* 41 F.3d 1081, 1093 (7th Cir.1994) (noting that two largest customers left plaintiff due to pricing, rather than challenged advertising).

Based on the record and taking all reasonable inferences in Dyneon's favor, the Court concludes that Dupont Dow's Motion for Summary Judgment on Dyneon's false advertising and deceptive trade practices claims should be granted. Although there are disputed fact issues on the element of falsity, Dyneon has not presented evidence that would allow a reasonable jury to rule in its favor on the issues of materiality or causation.

C. *The Renewed Motion for Summary Judgment on the Inequitable Conduct Defense.*

**1. Background.**

Dupont Dow's inequitable conduct defense was not the subject of discovery until late in the case, when it learned that the same attorney prosecuted the application that led to the '919 Patent and one of the relevant prior art patents. The patent prosecution attorney, James Lilly, represented both Dyneon and 3M in patent matters. (Ex. D at 14–14, Kenworthy 8/5 Decl.). Dupont Dow claims that Mr. Lilly breached his duty of candor and good faith to the Patent Office by failing to disclose relevant prior art and other matters during prosecution of the '919 patent. 3M moved for summary judgment earlier on this claim, but the Court "defer[red] judgment" because discovery was not yet com-

plete, and then "denied" the motion. (Sept. 25 Order at 17–18 (citing Fed. R.Civ.P. 56(f))). 3M's renewed motion argues that, with discovery complete and regardless of the materiality of the withheld references, no reasonable fact finder could find the requisite intent to deceive by clear and convincing evidence.

On January 13, 2005, the Patent Office granted Dupont Dow's Request for Reexamination of the '919 Patent. In addition, on January 11, 2005, the Federal Circuit issued an opinion in *Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.,* 394 F.3d 1348 (Fed.Cir.2005), a case involving inequitable conduct claims. After these post-hearing developments were brought to the Court's attention, the parties submitted supplemental briefing, at the Court's direction, on their significance, including the necessity for a stay of this action pending the completion of the reexamination proceedings. Order of January 31, 2005. The parties agree that the stage of this case makes a stay pending the completion of the reexamination proceedings unnecessary. Thus, the Court now considers the Motion for Summary Judgment on the inequitable conduct claim.

## 2. Undisputed Facts.

The undisputed facts are summarized below.

(1) Application No. 09/311,107, which led to the '919 Patent and which is assigned to Plaintiff Dyneon, was filed on May 13, 1999. (Ex. HH at 4, ¶ 6, Adkisson 7/12 Decl.). Application No. 09/058,537, which led to U.S. Patent No. 6,696,526 B1 to Kaulbach et. al. and which is assigned to 3M, was filed on April 10, 1998. (*Id.,* ¶ 7) ("the "Kaulbach '526 patent application" "). Attorney James Lilly was the attorney of record for both of these applications. (*Id.,* ¶¶ 6–8).

(2) Claim 1 of the '919 Patent reads:

A processing additive composition comprising a multimodal fluoropolymer having a Component A with a melt flow index ($MFI_A$) and Component B with a melt flow index ($MFI_B$), wherein the ratio $MFI_A$:$MFI_B$ is in the range of from 2:1 to 100:1.

(*Id.,* Ex. A).

(3) Claim 1 of the Kaulbach '526 Patent application reads:

A mixture of thermoplastic PFA fluoropolymers consisting essentially of units of tetrafluoroethylene, from 0.5 to 10 mol% of units of one or more perfluoroalkyl vinyl ethers having from 1 to 4 carbon atoms in the perfluoroalkyl radical and up to about 5 mol% of other fluoromonomers not containing hydrogen, the mixture comprising:

at least 10% by weight of the mixture and not more than 90% by weight of the mixture of at least one component A) with a melt flow index ($MFI_A$) $\geq 30$ g/10 min. and not more than 90% by weight of the mixture and at least 10% by weight of the mixture of at least one component b) with a melt flow index ($MFI_B$) $\leq 15$ g/10 min., the components being selected in such a way that the ratio of $MFI_A$ to $MFI_B$ is in the range from 80 to 2500.

(*Id.,* Ex. O). A PCT counterpart application to the Kaulbach '526 Patent application was filed on February 6, 1999. Claim 1 of the PCT '526 Patent application reads as follows:

A mixture of thermoplastic fluoropolymers essentially comprising units of tetrafluoroethylene and from 0.5 to 10 mol% of units of one or more perfluoro alkyl vinyl ethers having from 1 to 4 carbon atoms in the perfluoroalkyl radical, the mixture comprising:

— at least 10% weight and not more than 90% by weight of at least one component A) with an $MFI_A$ $\geq 30$ and

— not more than 90% by weight and at least 10% by weight of at least one component B) with an $MFI_B \leq 15$,

the components being selected in such a way that the ratio of the $MFI_A$ of component A) to the $MFI_B$ of component B is in the range from 80 to 2500.

(*Id.*, Ex. AA at 18).

(4) On October 22, 1999, the PTO rejected claims 1–8 and 15–17 of the Kaulbach '526 Patent application as unpatentable in view of European Patent Application EP 0 3 62 868 B1 to Ishiwari. (Ex. F at 4–5, Kenworthy 8/5 Decl.). In addition, Claims 7–8 of that application (which included "molecular weight ratio" as an element) were rejected as indefinite "because it [was] not known what type of molecular weight is being referenced." (*Id.* at 3).

(5) On April 24, 2000, Mr. Lilly responded in the Kaulbach '526 Patent application prosecution by describing the fluoropolymer composition of Ishiwari as "comprising at least two copolymers which have different molecular weight distribution." (Ex. G at 4, Kenworthy 8/5 Decl.) Mr. Lilly distinguished Ishiwari from the Kaulbach '526 Patent application based on the claimed melt flow index:

Since melt viscosity (MV) is proportional to 1/MFI, the MFI is proportional to 1/MV. Accordingly, the ratio $MFI_A$:$MFI_B$ may also be represented by $MV_B$:$MV_A$. When these calculations are performed, it can be seen that the maximum ratio permitted by the '868 [Ishiwari] reference is 60.

(*Id.* at 5). In responding to the indefiniteness rejection, on December 18, 2000, Mr. Lilly explained that "the concern about the type of molecular weight is "immaterial"

since the claims require a ratio." However, "one of skill in the art would be guided by the entire disclosure that consistently teaches MFI. This would lead the skilled person to consider viscosimetric average molecular weight[.]" (*Id.*, Ex. I at 13).[9]

(6) On December 27, 2000, the European Patent Office examining the PCT counterpart to the '919 Patent application issued a preliminary examination report that identified, among other references, the Kaulbach PCT '526 application as potentially relevant, stating:

[A]t least [the Kaulbach PCT '526 application] could become relevant in a further national phase, eg before the EPO. [The Kaulbach PCT '526 application] discloses a bimodal fluoropolymer falling within the scope of claims 1–3, 5–7, 11 and 24 (see claims and Example 2). The fact that the fluoropolymer is called a process additive composition in the present application can not render the subject-matter of these claims novel.

(Ex. TT at 4, Adkisson 7/12 Decl.).

(7) On September 28, 2000, the Examiner responsible for the '919 Patent application rejected the pending claims as unpatentable in view of a patent to Blong, combined with a patent to Kmiec or a patent to Winter. The Examiner noted that "Blong does not teach processing aids comprising multimodal fluoropolymers," but concluded it would be obvious to modify Blong in light of the teachings of Kmiec or Winter. (*Id.*, Ex. F at 4–5). In a response dated December 22, 2000, Mr. Lilly distinguished the prior art as follows:

The present invention requires a multimodal fluoropolymer. While Blong de-

---

**9.** The same arguments distinguishing Ishiwari were made in this filing, an appeal to the Board of Patent Appeals & Interferences. *See* Ex. I at 13–15, Kenworthy 8/5 Decl. On June 27, 2003, the Board overturned the Examin-

er's Section 112 indefiniteness rejection and the rejection based on Ishiwari (Ex. V, Adkisson 7/12 Decl.). The Kaulbach '526 Patent then issued on February 24, 2004. (*Id.*, Ex. O).

scribes fluoropolymers as process aids, it does not teach or suggest using the inventive multimodal fluoropolymer. Kmiec describes multimodal polyolefins (column 3 lines 1–10), and includes a fluoropolymer process aid in a standard test formulation (column 14 Table VI). There is no teaching or suggestion to use a multimodal fluoropolymer process aid. Winter describes a metallocene catalyst system useful in producing polyolefins having a multimodal molecular weight distribution (column 1 lines 53–65).

(*Id.*, Ex. G at 4). Mr. Lilly also pointed out that "all claims of the present invention require the melt flow index ratio of two fluoropolymer components to be in the range of 2:1 to 100:1. There is nothing in any of the cited references to teach or suggest the required ratio, or any particular melt flow index of the fluoropolymer process aid [in Blong or Kmiec]." (*Id.* at 5)

(8) During prosecution of the '919 Patent application, Mr. Lilly filed an Information Disclosure Statement, and a Supplemental Information Disclosure Statement, on July 27, 1999 and July 18, 2000, respectively. (*Id.*, Exs. Y, Z). The Supplemental Statement disclosed the PCT publication of the '526 Kaulbach application, but did not include the Kaulbach '526 Patent application; the Ishiwari reference; or, the Office Actions rejecting the claims of the Kaulbach '526 Patent application. (*Id.*). A Notice of Allowance for the '919 Patent issued on March 21, 2001 (*Id.*, Ex. H). The International Preliminary Examination Report for the PCT counterpart of the '919 Patent application, which acknowledged the potential relevance of the Kaulbach PCT '526 application, was not disclosed at any time.

(9) Mr. Lilly did not disclose these prior art references or other materials because after review he determined each to be not material. (Kenworthy 8/5 Decl., Ex. D at 20 [PCT search report], 38–41 [office action rejecting Kaulbach claims based on indefiniteness], 48 & 77 [Ishiwari], 65, 71–72 [Kaulbach U.S. patent application]). The PCT publication of the '526 Kaulbach application, which was disclosed, is not prior art to the '919 Patent although the U.S. '526 Kaulbach patent is prior art to the '919 Patent. (*Id.*, Ex. D at 71–72).

(10) The only element of the '919 Patent that is missing from the Kaulbach '526 Patent application and from Ishiwari is the preamble ("a processing additive composition"). (*Id.*, Ex. D at 78–79).

### 3. Legal Standards.

▮▮▮ The patent applicant and attorneys practicing before the Patent Office owe a duty to prosecute applications and to argue for patentability with candor, honesty, and in good faith. *Elk Corp. of Dallas v. GAF Building Materials Corp.*, 168 F.3d 28, 30 (Fed.Cir.1999); 37 C.F.R. § 1.56(c) (2004). Failure to abide by this duty constitutes inequitable conduct, which can render a patent unenforceable. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995). Inequitable conduct can result from a failure to disclose material information with an intent to mislead or deceive the patent examiner. *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546 (Fed.Cir. 1998). Both materiality and intent are questions of fact that must be proven by the party charging inequitable conduct by clear and convincing evidence, *Abbott Labs. v. Torpharm, Inc.*, 300 F.3d 1367, 1379 (Fed.Cir.2002), that is, with a "firm belief or conviction that the matter sought to be established is highly probable and free from serious doubt." *Transclean Corp. v. Bridgewood Servs., Inc.*, 77 F.Supp.2d 1045, 1070 (D.Minn.1999) (*quoting Maxwell v. K Mart Corp.*, 880 F.Supp. 1323, 1329 (D.Minn.1995)), *aff'd in part,*

*vacated in part on other grounds,* 290 F.3d 1364 (Fed.Cir.2002).

The Patent Office has established the following standard for materiality for applications filed after March 16, 1992:

> Information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and
>
> (1) it establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with,. a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of unpatentability.

37 C.F.R. § 1.56(b) (2004). The Federal Circuit has recently held that materiality should be evaluated under this amended rule for applications pending after the effective date of this amendment. *Bruno Independent Living Aids, Inc. v. Acorn Mobility Servs., Ltd.,* 394 F.3d 1348, 1352 (Fed.Cir.2005).

■ The factual question of intent "rarely include[s] direct evidence of admitted deceitful conduct." *GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1274 (Fed. Cir.2001). Intent is instead more often proven by showing acts the natural consequence of which are presumed to be intended by the actor. *Molins,* 48 F.3d at 1180. In addition, assessment of the evidence of intent can operate on a sliding scale relative to materiality. In other words, the greater the showing of materiality, the more likely that intent can be presumed. *Life Techs., Inc. v. Clontech Lab., Inc.,* 224 F.3d 1320, 1324 (Fed.Cir. 2000) ("the court must conduct a balancing test between the levels of materiality and intent, with the greater showing of one factor allowing a lesser showing of the other."); *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1455

(Fed.Cir.1984) ("a greater showing of materiality of withheld information would necessarily create an inference that its non-disclosure was wrongful."). Yet the mere withholding of material references is not enough to presume intent. *Transclean Corp.,* 77 F.Supp.2d at 1090 (*citing Hebert v. Lisle,* 99 F.3d 1109, 1116 (Fed. Cir.1996)). Rather, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 876 (Fed.Cir.1988); *see also Id.* at 873 (conduct must be "sufficient to require a finding of deceitful intent in light of all the circumstances"). Finally, it bears noting that the intent in question is an intent to deceive the patent office into issuing the patent, not merely the intent to do what was done in prosecution. *Therma–Tru Corp. v. Peachtree Doors, Inc.,* 44 F.3d 988, 995 (Fed.Cir. 1995) ("intent ... does not mean that the inventor intended to do what he did in patent prosecution; it means that the inventor intended to deceive or mislead the examiner into granting the patent.").

Once the requisite showings of materiality and intent are made, the Court weighs those elements in light of the circumstances to determine whether the conduct is so culpable that the patent is unenforceable. *GFI, Inc.,* 265 F.3d at 1273.

**4. Materiality.**

■ Dupont Dow rests its inequitable conduct claim on two categories of withheld information: (1) the Ishiwari and Kaulbach '526 patent application prior art; and, (2) the indefiniteness rejection of the Kaulbach '526 patent application claims. Dupont Dow Opp'n Br. at 11.

Although Dyneon claimed it was not contesting materiality for purposes of this

Motion, Tr. at 34, in fact it urged the Court to assume the materiality is low or "very marginal." *Id.* Dupont Dow, on the other hand, argues that the materiality of the withheld references and information is "very high." *Id.* at 41. In its post-hearing brief, Dupont Dow argues that the reexamination grant "mandates that, for purposes of summary judgment, these references must be deemed to be highly material." (Feb. 14 B.R. at 1). Dyneon concedes the PTO's decision is relevant to materiality. (Feb. 14 B.R. at 1).

Dyneon contends the materiality of the withheld references is low because these references did not disclose a critical element of the '919 Patent, the "processing additive composition" element. This distinction is not enough by itself to assign low materiality since the patentability of the claims over a withheld reference is not the standard. *See Molins,* 48 F.3d at 1179; *Gardco Mfg., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1214 (Fed.Cir.1987); *A.B. Dick Co. v. Burroughs Corp.,* 798 F.2d 1392, 1397 (Fed.Cir.1986) ("the test for materiality is not whether there is anticipation or obviousness").[10]

[A] difference in a single element in a withheld reference, however important that element may be to the patented invention, is not automatically dispositive of materiality.... References lacking different elements are often combined to reject an application under 35 U.S.C. § 103.... In other words, materiality is not analyzed in a vacuum. It is not dependent upon a single element viewed in isolation. Rather, it is judged based on the overall degree of similarity between the omitted reference and the claimed invention in light of the other prior art before the examiner.

*Baxter Int'l, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1328 (Fed.Cir.1998).

Dupont Dow contends that the materiality of the withheld Kaulbach & Ishiwari references is high, because the sole distinction on which Mr. Lilly deemed these references immaterial (absence of the preamble limitation) cannot as a matter of law impart patentability to composition claims, citing *In Re Schreiber,* 128 F.3d 1473 (Fed. Cir.1997) and *In Re Spada,* 911 F.2d 705 (Fed.Cir.1990). Alternatively, Dupont Dow argues that these references are material because they refute or are inconsistent with arguments made by Mr. Lilly during prosecution. *See Bruno Independent Living Aids, Inc.,* 394 F.3d at 1352 (citing 37 C.F.R. § 1.56 (2004)). Dupont Dow points out that the combination of references the Examiner cited in rejecting the '919 Patent claims were missing a multimodal fluoropolymer and the claimed melt flow ratio, but both of those elements were disclosed in Kaulbach and in Ishiwari, thereby establishing materiality. Dupont Dow has submitted the Joint Report of Lisa Dolak & Jeffrey Lindeman, which offers expert opinions explaining the prior art that was before the Office in the '919 patent prosecution, the disclosures of Kaulbach and Ishiwari, and how the arguments made in responding to the Section 103 rejection of the '919 patent claims could not have been made if Kaulbach and Ishiwari had been disclosed. (Ex. B, Adkisson 10/25 Decl.). Dyneon offers the Expert Report of Larry Nixon, which disagrees with Dolak and Lindeman on virtually every point. (*Id.,* Ex. C).

Taking the facts and reasonable inferences therefrom in Dupont Dow's favor, as the Court must do at this stage, the Court

10. The Court recognizes that these cases were decided under the former Rule 1.56 standard for materiality. However, the new rule "was not intended to constitute a significant substantive break in the previous standard[.]" *Hoffmann–La Roche, Inc. v. Promega Corp.,* 323 F.3d 1354, 1366 n. 2 (Fed.Cir.2003).

finds that a reasonable fact finder could find by clear and convincing evidence that the Kaulbach '526 patent application and Ishiwari were material in light of the arguments made in December, 2000 to overcome the claim rejection in the '919 Patent application, particularly in light of the conflicting expert opinions. *See Dayco Prods., Inc. v. Total Containment, Inc.,* 329 F.3d 1358, 1367 (Fed.Cir.2003) ("whether [withheld] reference meets the threshold level of materiality would require a detailed factual analysis of the relevance of the teachings of that reference both with respect to the claims of the patents-in-suit and with respect to the other prior art references that were before the examiner.").

Dyneon argues that Kaulbach and Ishiwari are immaterial because they were cumulative of other art before the Office, specifically the Kmiec reference. On this point, however, there is a significant dispute in the record. A cumulative reference is, by definition, not material. 37 C.F.R. § 1.56(b) (2004). Dyneon argues that the relevant elements of Claim 1 of the '919 Patent, with the exception of the preamble distinction, are found in the Kmiec reference that was before the Examiner. Dyneon's expert Nixon agrees. (Ex. C, Adkisson 10/25 Decl.). Dupont Dow points out, however, that this argument is inconsistent first, with respect to positions Dyneon took before the Patent Office when it distinguished the Kmiec reference by noting that "nothing in any of the cited references" taught or suggested the claimed melt flow ratio (Ex. G at 5, Adkisson 7/12 Decl.); and second, with respect to Mr. Lilly's testimony that Kmiec does not disclose a multimodal fluoropolymer while both Kaulbach and Ishiwari disclose that element. (Ex. D at 77–

78, Kenworthy 8/5 Decl.) Taking the facts and reasonable inferences therefrom in a light most favorable to Dupont Dow, a reasonable fact finder could find, by clear and convincing evidence, that Ishiwari and the Kaulbach '526 patent application are not cumulative to the Kmiec reference.

The Court reaches a different conclusion, however, with respect to the indefiniteness rejection in the Kaulbach '526 patent application. That rejection was based on the claim term, "molecular weight," which is not an element of the '919 patent claims. Rather, the construction of the claim term "multimodal" incorporates the specification reference to "molecular weight." Dupont Dow argues that this rejection is information that a reasonable examiner would want to know, citing *Dayco Prods.,* 329 F.3d at 1368 (noting that knowledge of different interpretations of substantially similar claims is information that an examiner would consider important). The "reasonable examiner" standard is the old test for materiality that was not used by the Federal Circuit in *Bruno Independent Living Aids.* In addition, Dupont Dow does not explain how the claims can be considered "substantially similar" when the '919 Patent claims do not include the element on which the indefiniteness rejection was issued in the Kaulbach '526 application. Dupont Dow alternatively argues that the rejection in the Kaulbach '526 application establishes a prima facie case of unpatentability (the newer standard). However, beyond making this assertion, it does not explain this argument in light of the evidence of record.[11]

### 5. Intent

▮ Dupont Dow must still show, however, that material factual disputes remain

---

**11.** The Dolak–Lindemann Expert Report also opines the rejection is material under the new Rule 56 standard, but does not explain this opinion. Ex. B at 19–20, Adkisson 10/25 Decl.

on the issue of intent. It is undisputed that Mr. Lilly knew of the Kaulbach '526 Patent application, knew of the Ishiwari reference, and knew of the findings in the PCT preliminary search report. It is also undisputed that Mr. Lilly did not disclose these references or Office Actions to the Examiner responsible for the '919 Patent application, even though the Federal Circuit requires the applicant to err on the side of disclosure, particularly in close cases. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed.Cir.1997) (close cases should be resolved by disclosure); *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed.Cir.1992) ("Close cases should be resolved by disclosure, not unilaterally by applicant."). Finally, it is undisputed that Mr. Lilly distinguished the prior art cited by the Examiner in the '919 patent application by noting the absence of two elements that are found in the withheld references, namely the multimodal fluoropolymer and the melt flow ratio.

Taking the disputed facts and reasonable inferences in Dupont Dow's favor, the Court concludes that summary judgment on the issue of intent would be inappropriate at this time. First, a reasonable fact finder could find the requisite intent by clear and convincing evidence because the Examiner accepted "an argument for patentability that could not have been made had the art been disclosed." *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1275 (Fed. Cir.2001). Second, a fact finder could find that the materiality of references disclosing every element but the preamble, particularly in light of the PCT preliminary report finding that single distinction may not be enough, is sufficiently high to support an inference of an intent to deceive. *See GFI, Inc.*, 265 F.3d at 1275 (difficult to establish subjective good faith where applicant knew of high degree of materiality); *Kemin Foods L.C. v. Pigmentos Vegetales Del Centro S.A.*, 2004 WL 2723686 at *,

2004 U.S. Dist. LEXIS 17737 at *36–39 (S.D.Iowa, Sept. 2, 2004) (denying motion for summary judgment on intent element where inventors knew of withheld reference and made unilateral decision to withhold it from patent office). Third, a reasonable fact finder could find the requisite intent based on Mr. Lilly's role in prosecuting the '919 and the Kaulbach '526 patent applications, as well as the timing of various events in those prosecutions. *See KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1577 (Fed.Cir.1985) (intent requires "the fact finder to evaluate all the facts and circumstances in each case. Such an evaluation is rarely enabled in summary proceedings.") (citation omitted). In this context, Dyneon's argument that the disclosure of the Kaulbach PCT '526 application is indicative of Mr. Lilly's good faith is simply part of the circumstances that should be considered by the fact finder, given the non-prior art status of that application versus the prior art withheld application.

Dyneon argues that summary judgment is proper even if the withheld references are material if Mr. Lilly's reasons for withholding these references are "plausible," citing *Dayco Products*, 329 F.3d at 1367. Dyneon points out in its post-hearing brief that the recent decision in *Bruno Indep't Living Aids* reaffirmed the plausability standard. *See* 394 F.3d at 1354 (noting no credible explanation for nondisclosure proffered). Dyneon argues that plausibility is evidenced by the significance of the preamble limitation to this Court's earlier Order granting summary judgment based in part on that limitation; and, the Board of Patent Appeal's reversal of the Ishiwari prior art rejections in the Kaulbach '526 patent application. Assessing the plausibility of Mr. Lilly's decisions, however, would require the Court to accept the accuracy of his materiality judgment based on post-issuance events, rather than on the

arguments made to secure the '919 Patent. While plausibility may be indicative of good faith, like credibility, this is an element that should be weighed by the fact finder.

For example, the only evidence recited by the *Dayco* Court was the attorney's knowledge of the reference, the fact that the reference was withheld, and the attorney's explanation that the reference was "far afield" from the patents at issue. 329 F.3d at 1367. Here, Dupont Dow has presented evidence not only of knowledge of withheld references, but also Mr. Lilly's admission that the preamble is the only difference between the withheld references and the '919 Patent claims. Taking the reasonable inferences in Dupont Dow's favor, a fact finder could conclude that these references are highly material prior art, not "far afield" from the '919 Patent. A reasonable fact finder could also decide that the basis on which the references were withheld conflicts with the preliminary determination in the PCT application and conflicts with arguments made about the gaps in the prior art. This is a far different record than *Dayco*, and one that requires the fact finder's resolution.[12]

In the event the Court denied this Motion for Summary Judgment, Dyneon

moved in the alternative for a bench trial on the inequitable conduct claim, severing that claim from the trial of the other claims. The Court denies this Motion, at this time. Inequitable conduct is a claim tried to the court, *see Cabinet Vision v. Cabnetware*, 129 F.3d 595, 600 n. 4 (Fed. Cir.1997). Dupont Dow argues that the equitable and legal claims that will be before the Court and before a jury share common factual questions, common witnesses, and common exhibits, specifically with respect to its validity challenge to the '919 Patent under 35 U.S.C. § 103. In this context, Dupont Dow argues that the Court's determination of the equitable claims cannot deprive the party of a jury trial on the legal claim. *Therma–Tru Corp. v. Peachtree Doors, Inc.*, 44 F.3d 988, 994–95 (Fed.Cir.1995). If the Court bifurcated the inequitable conduct claim, it appears that evidence would have to be introduced again, and witnesses would testify twice, at least with respect to prior art issues. Rather than engage in a duplication of resources, the Court denies the Motion to Bifurcate.

For the foregoing reasons and based on all of the files, records, and proceedings

---

**12.** Dyneon cited several cases for the argument that summary judgment is properly granted on the intent element. Each, however, is distinguishable from the facts in this case. *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 126 F.Supp.2d 69, 139–47 (D.Mass.2001), *aff'd*, 314 F.3d 1313, 1358 (Fed.Cir.2003) (court-tried case in which each alleged piece of material information was disclosed to the Patent Office at some point in the prosecution. *See id.* at 139 (Goldwasser study disclosed in interference action, and evidence established that examiner responsible for patent prosecution reviewed interference record); *Id.* at 142, 146 ("the Egrie Input was disclosed and considered" by the PTO; "Amgen disclosed the '293 experiments"); *Id.* at 146–47 ("Amgen directly informed" the PTO of the litigation)); *Norian*

*Corp. v. Stryker Corp.*, 363 F.3d 1321, 1328, 1330–31 (Fed.Cir.2004) (no showing of intent to deceive where prior art reference, which patentee mischaracterized to Patent Office, was before the Examiner throughout the prosecution); *Abbott Labs. v. Torpharm, Inc.*, 300 F.3d 1367, 1380 (Fed.Cir.2002) (no dispute that "the record fails to show that the mystery crystal was produced by any process similar to that disclosed in the patent...."); *Matsushita Elec. Ind. Co., Ltd. v. Cinram Int'l, Inc.*, 299 F.Supp.2d 348, 360–61 (D.Del.2004) ("no evidence of record that [the inventor] knew of" the withheld references); *Alfa Leisure, Inc. v. King of the Road*, 314 F.Supp.2d 1010, 1016 (C.D.Cal.2004) (no evidence of an intent to deceive, "such as circumstantial evidence showing that Alfa engaged in a pattern of nondisclosure").

herein, **IT IS HEREBY ORDERED THAT:**

1. Defendant Dupont Dow Elastomer's Motion for Construction of Additional Claim Terms [Docket No. 161] is granted and denied in part. The claim constructions set out in Section III(A) of this Memorandum and Order shall govern the construction of those terms at the trial of this case;

2. Defendant Dupont Dow Elastomers' Motion for Summary Judgment on Plaintiffs' False Advertising and Deceptive Trade Practices Claims [Docket No. 166] is granted, and those claims are dismissed; and,

3. Plaintiffs' Renewed Motion for Summary Judgment on Defendant Dupont Dow Elastomers' Inequitable Conduct Defense or in the alternative for a Bench Trial [Docket No. 179] is denied.